JOHNSON & WEAVER, LLP
FRANK J. JOHNSON (174882)
frankj@johnsonandweaver.com
PHONG L. TRAN (204961)
phongt@johnsonandweaver.com
600 West Broadway, Suite 1540
San Diego, CA  92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Attorneys for Plaintiff JIM PORTER*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIM PORTER, derivatively on behalf of TWITTER, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>RICHARD COSTOLO, ANTHONY NOTO, JACK DORSEY, PETER FENTON, MARTHA LANE FOX, HUGH F. JOHNSTON, OMID KORDESTANI, DEBRA L. LEE, DAVID ROSENBLATT, MARJORIE SCARDINO, BRET TAYLOR, and EVAN WILLIAMS,<br><br>    Defendants,<br><br>  -and-<br><br>TWITTER, INC.,<br><br>    Nominal Defendant. | Case No.: 3:16-cv-06136<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

By and through his undersigned counsel, Plaintiff Jim Porter ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Twitter, Inc. ("Twitter" or the "Company") and against certain current and former officers and directors of the Company for issuing false and misleading proxy statements in violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duties, unjust enrichment, corporate waste, and insider selling.  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Twitter and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on Twitter's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from the related pending securities fraud class action, *Shenwick v. Twitter, Inc. et al.*, Case No. 3:16-cv-05314 (N.D. Cal.) (the "Securities Class Action"); and (e) review of other publicly available information concerning Twitter and the Individual Defendants (defined below).

## NATURE AND SUMMARY OF THE ACTION

1.      Twitter is an online social networking platform that enables users to send and read short 140-character messages called "tweets."  The Company's primary source of revenue is advertising, and advertising revenue is largely driven by the total number of users on the Twitter platform and the level of engagement of those users.

2.      Twitter historically relied on two metrics to measure the number of users and user engagement: (i) Monthly Average Users ("MAUs"), which is an indicator of the Company's total user base, and (ii) timeline views, which provide insight on user engagement.

3.      Since at least February 5, 2015 through the present (the "Relevant Period"), the Individual Defendants caused Twitter to issue false and misleading statements concerning the Company's business, operations, and financial prospects, including misrepresentations regarding user growth rate and user engagement.  Specifically, the Individual Defendants caused the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company to make false and/or misleading statements, and/or failed to disclose that: (i) new product initiatives were not creating meaningful growth in MAUs or user engagement; (ii) the reported growth in MAUs was the result of increased numbers of low-quality MAUs, which were less engaged than pre-existing Twitter users; (iii) by early 2015, the Company was tracking daily active users ("DAUs"), rather than timeline views as the primary user engagement metric; and (iv) by early 2015, the Company's metrics showed that user engagement growth was flat or declining.

4. As a result of the foregoing false and misleading statements issued by the Individual Defendants, the Company's stock price rose dramatically, reaching artificially inflated prices as high as $52.87 during the Relevant Period.

5. While the Company's stock price was artificially inflated, certain Individual Defendants exploited their positions as corporate fiduciaries of Twitter and, with knowledge of material, adverse, and non-public information regarding the Company's operations and business prospects, sold their personal stock holdings for **hundreds of millions of dollars in insider profits**.

6. On July 28, 2015, the truth about the Individual Defendants' false and misleading statements regarding the Company's user growth rate and user engagement began to emerge. On that date, the Individual Defendants caused Twitter to issue a press release announcing the Company's second quarter 2015 financial results, revealing that the Company's MAUs had increased by only 2 million users over the prior quarter, representing slight growth of less than 1%. After issuing the press release, Twitter hosted a conference call with investors and analysts, during which the Company's CFO, Defendant Anthony Noto, explained that Twitter was experiencing low user growth rate and would continue to experience low growth in the foreseeable future:

> **[I]n the near term, our organic growth is going to be very low, as it was this quarter** and as I think about Q3, it's marginally better. But I wouldn't want you to or anyone else to expect change in our growth rate relative to what you're seeing this quarter. **I think you'll see that for a while, and that was my point.**

7.     The conference call also revealed that the Company's highly-touted product initiatives had failed to have a meaningful impact on increasing user numbers or user participation, and that Twitter did not expect to see meaningful growth in MAUs for "a considerable period of time."

8.     The market reacted negatively to these revelations, as the Company's stock price declined nearly 15% in one day, falling $5.30 per share to close at $31.24 on July 29, 2015, resulting in a loss of hundreds of millions of dollars in market capitalization.

9.     Since the July 28, 2015 revelation, the Company has continued to report slow user growth, and Twitter's stock price has continued to decline.  Despite these poor financial results, Twitter's senior officers continue to be rewarded with lavish compensation, and have personally profited at the expense of the Company and its shareholders.

10.     Twitter's Board of Directors (the "Board") has not, and will not commence litigation against the Individual Defendants named in this complaint, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to Twitter for authorizing or failing to correct the false and misleading statements alleged herein and for failing to correct and/or implement the necessary internal controls to prevent the harm to the Company that has occurred.  Accordingly, a pre-suit demand upon the Board is a useless and futile act. Thus, Plaintiff rightfully brings this action to vindicate Twitter's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to Twitter.

**JURISDICTION AND VENUE**

11.     The Court has jurisdiction over all claims under 28 U.S.C. § 1331 in that the Complaint states a federal question.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in California, or is an individual who has sufficient minimum contacts with California so as to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the acts and practices complained of herein occurred in this District.

14.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

**THE PARTIES**

**A.     Plaintiff**

15.     Plaintiff Jim Porter has been a Twitter shareholder since November 2013 and is, and at all relevant times has been, a holder of Twitter common stock.

**B.     Nominal Defendant**

16.     Nominal Defendant Twitter is incorporated in Delaware, and its principal executive offices are located at 1355 Market Street, Suite 900, San Francisco, California 94103. The Company's common stock is traded on the New York Stock Exchange under the ticker symbol "TWTR."  The Company has more than 700 million shares outstanding.

**C.     Individual Defendants**

17.     Defendant Richard Costolo ("Costolo") was Twitter's CEO from October 2010 until July 1, 2015, and a member of the Company's Board from 2007 until September 30, 2015. Costolo is a defendant in the Securities Class Action.  He received $91,795 in total compensation from Twitter in 2015.  During the Relevant Period, while in possession of material, non-public information, Costolo sold at least 77,009 personally held shares of Twitter stock at artificially inflated prices for proceeds of more than $3 million.

18.     Defendant Anthony Noto ("Noto") has been the Chief Financial Officer ("CFO") of the Company since July 2014.  Noto is a defendant in the Securities Class Action.  Noto received $401,281 in total compensation from Twitter in 2015, and $72,768,098 in total compensation from Twitter in 2014.

19.     Defendant Jack Dorsey ("Dorsey") has been Twitter's CEO since September 2015 and a member of the Board since May 2007.  Dorsey served as the Company's interim CEO

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

from July 2015 to September 2015, and was President and CEO from May 2007 to October 2008.  Dorsey also served as Chairman of the Board from October 2008 to September 2015. Dorsey received $68,506 in total compensation from Twitter in 2015.  During the Relevant Period, while in possession of material, non-public information, Dorsey sold at least 75,630 personally held shares of Twitter stock at artificially inflated prices for proceeds of approximately $3.6 million.

20.    Defendant Peter Fenton ("Fenton") has been a member of Twitter's Board since February 2009.  During the Relevant Period, Fenton was a member of the Audit Committee and the Chair of the Compensation Committee.  Fenton received $305,000 in total compensation from Twitter in 2015.

21.    Defendant David Rosenblatt ("Rosenblatt") has been a member of Twitter's Board since December 2010.  During the Relevant Period, Rosenblatt was a member of the Nominating and Governance Committee and the Compensation Committee.  Rosenblatt received $295,000 in total compensation from Twitter in 2015.

22.    Defendant Marjorie Scardino ("Scardino") has been a member of Twitter's Board since December 2013.  During the Relevant Period, Scardino was a member of the Audit Committee and the Compensation Committee.   Scardino received $295,000 in total compensation from Twitter in 2015.

23.    Defendant Evan Williams ("Williams") has been a member of Twitter's Board since May 2007.  Williams received $295,000 in total compensation from Twitter in 2015. During the Relevant Period, while in possession of material, non-public information, Williams sold many millions of personally held shares of Twitter stock at artificially inflated prices for proceeds of approximately $274.5 million.

D.    **Non-Party Directors**

24.    Omid Kordestani ("Kordestani") is a not a defendant in this action.  Kordestani was appointed Executive Chairman of Twitter's Board in October 2015.   Despite being employed in that capacity for less than two months, Kordestani received $12,361,615 in total compensation from Twitter in 2015.  As inducement to join Twitter, Kordestani received a grant

of 800,000 non-qualified stock options. The non-qualified stock options vest 25% on the first day of the month following Kordestani's twelve month employment anniversary and 6.25% are subject to quarterly vesting thereafter based on continued employment over the remainder of the vesting period.  Kordestani also received a grant of 400,000 performance-based restricted stock units ("PRSUs"), and will be eligible to earn 100,000 PRSUs at target in each of 2016 through 2019.

25.     Martha Lane Fox ("Fox") is not a defendant in this action.  She was appointed to Twitter's Board in April 2016.  Pursuant to Twitter's Outside Director Compensation Policy, described in Twitter's Proxy Statement for its 2015 annual meeting of stockholders, Fox is entitled to annual cash and equity compensation of $275,000.

26.     Hugh F. Johnston ("Johnston") is not a defendant in this action.   He was appointed to Twitter's Board in April 2016.  Johnston is the Chair of the Audit Committee. Pursuant to Twitter's Outside Director Compensation Policy, described in Twitter's Proxy Statement for its 2015 annual meeting of stockholders, Johnston is entitled to annual cash and equity compensation of $305,000.

27.     Debra L. Lee ("Lee") is not a defendant in this action.  She was appointed to Twitter's Board in May 2016.  Lee is the Chair of the Nominating and Governance Committee. Pursuant to Twitter's Outside Director Compensation Policy, described in Twitter's Proxy Statement for its 2015 annual meeting of stockholders, Johnston is entitled to annual cash and equity compensation of $290,000.

28.     Bret Taylor ("Taylor") is not a defendant in this action.  He was appointed to serve on Twitter's Board in July 2016.  Pursuant to Twitter's Outside Director Compensation Policy, described in Twitter's Proxy Statement for its 2015 annual meeting of stockholders, Taylor is entitled to annual cash and equity compensation of $275,000.

29.     Defendants identified in ¶¶ 17-23 are sometimes referred to herein as the "Individual Defendants."

30.     Defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams are sometimes referred to herein as the "Director Defendants."

31.     Defendants Fenton and Scardino are sometimes referred to herein as the "Audit Committee Defendants."

32.     Defendants Costolo, Dorsey, and Williams are sometimes referred to herein as the "Insider Selling Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background to the Relevant Period**

33.     Twitter was founded in March 2006, and the Twitter platform was introduced to the public in July 2006.  Twitter provides an online social networking platform that enables users to send and read short 140-character messages called "tweets."

34.     After its launch, the Company experienced rapid growth, with Twitter users posting approximately 400,000 tweets per quarter by 2007.  By June 2010, Twitter users were posting around 65 million tweets per day, which jumped to 140 million tweets posted per day by March 2011.

34.     Twitter completed its initial public offering ("IPO") on November 7, 2013 at $26.00 per share, with shares closing at $44.90 the same day.  Twitter's successful IPO can largely be attributed to two important user metrics, *inter alia*: (i) MAUs (a measure of the total user base); and (ii) timeline views (a measure of user engagement).  Following the IPO, Twitter's stock price continued to surge, reaching as high as $73.31 per share in December 2015.

35.     On November 12, 2014, Twitter's then-CEO, Costolo, and CFO Noto hosted a nearly eight hour "Analyst Day" presentation for stock analyst.  During the presentation, Defendants Costolo and Noto highlighted new product features that would be added to the Twitter platform, and addressed concerns about user growth.  As reported by Advertising Age that day:

> At its inaugural Analyst Day on Wednesday, the social media company unveiled a host of features designed to lure in new people, but also ambitions to measure and make money from people that see Twitter content without signing in. And for the first time, Twitter offered numbers for what it calls "logged out" users: 500 million unique visitors a month.

> Twitter has hinted frequently in recent quarters at its desire to convey and capitalize on its audience beyond its 284 million active registered users. On Wednesday it made that goal more explicit. "We want Twitter to be nothing less

7

than the very best way to keep up with your world," CEO Dick Costolo said at the start of the event. "We have a goal to build the largest daily audience in the world."

*    *    *

Twitter also attached metrics to these various levels of reach, some for the first time. Overall, Twitter content achieves 185 billion impressions a month, the company said. Some 200 million unique visitors each month land on Twitter profile pages, primarily those of celebrities and brands, without signing into an account. And another 75 million arrive via search, where the company said it was expanding its product portfolio.

Under these new metrics, Twitter would reach 2 billion monthly active users, at its current growth rate, by 2020, Mr. Noto told investors. Mr. Noto dropped another ambitious projection: Twitter revenue would hit $14 billion 10 years after this one, when it hit $1 billion in revenue. The company has netted around $1.2 billion in its last four quarters.

36.    Due to the optimistic statements presented by Twitter's senior management during the November 12, 2014 Analyst Day, investors and analysts believed that the Company's user metrics were reliable and that user growth and engagement would continue to trend significantly upward.

**The Individual Defendants Caused the Dissemination of False and Misleading Statements During the Relevant Period**

37.    On February 5, 2015, the start of the Relevant Period, the Individual Defendants caused Twitter to issue a press release and file a current report on Form 8-K with the SEC announcing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2014.  For 2014, Twitter reported non-GAAP net income of $101 million, or $0.14 per diluted share, on revenue of $1.4 billion, compared to non-GAAP net income loss the previous year of $34.3 million, or −$0.18 per diluted share, on revenue of $664.9 million. The press release stated in relevant part:

"We closed out the year with our business advancing at a great pace. Revenue growth accelerated again for the full year, and we had record quarterly profits on an adjusted EBITDA basis," said Dick Costolo, CEO of Twitter. "In addition, the trend thus far in Q1 leads us to believe that the absolute number of net users added in Q1 will be similar to what we saw during the first three quarters of 2014."

*    *    *

8

**Fourth Quarter 2014 Operational Highlights**

Average Monthly Active Users (MAUs) were 288 million for the fourth quarter, an increase of 20% year-over-year, which reflects a loss of approximately 4 million net Monthly Active Users in the fourth quarter due to changes in third party integrations.

Average Mobile MAUs represented approximately 80% of total MAUs.

Timeline views reached 182 billion for the fourth quarter of 2014, an increase of 23% year-over-year.

Advertising revenue per thousand timeline views reached $2.37 in the fourth quarter of 2014, an increase of 60% year-over-year.

\*         \*         \*

**Fourth Quarter 2014 Financial Highlights**

**Revenue** – Revenue for the fourth quarter of 2014 totaled $479 million, an increase of 97% compared to $243 million in the same period in 2013.

38.     That same day, the Individual Defendants caused the Company to host a conference call with analysts and investors during which Defendant Noto discussed user metrics:

In terms of engagement metrics, as I mentioned, we're no longer going to provide the metric of timeline view.  And the reason for that is it's really a measurement that doesn't reflect the initiatives that we're doing. In fact, if anything, we're taking specific initiatives and product changes that will hurt timeline view. . . .

And so that's why we decided to eliminate the timeline view metric, given that we have specific product changes that will hurt that metric. More broadly, as we think about engagement, there are a number of different ways that we measure engagement – there's no one perfect way. When it comes to advertising, it's going to be click-through rate.  And it's actually different by each format. A mobile app download click-through rate is very different than a regular Promoted Tweet that could be either re-tweeted or favorited as a measurement of payment.

And so as we get to a point where we have a metric that's going to really reflect what we're trying to do, we'll share that with you. But, at this point, there's a number of them that we look at, and no one metric to share.

39.     Also, during the conference call, Defendant Costolo discussed the success of the new product features that the Company had previously introduced during the Analyst Day and the positive impact those features were having on driving growth:

[Analyst:]  On the MAU number . . . I'm curious as to the acceleration [in MAU growth] there, if that's seasonality or something else?

[Defendant Costolo:]  Sure. Thanks, Paul, this is Dick. In Q1, I would say it's a combination of seasonality, a return to organic growth, ***and the set of product***

9

***initiatives we've created to drive growth***.[1] Again, at a high level, I'd like to say that I'm thinking about growth and our product as, these changes we're making now as helping us grow across logged-in, logged-out, and our syndicated audience across the web and third-party mobile apps.

The user numbers we saw on January, again, indicate that our MAU trend ***has already turned around***, and that Q1 trend is likely to be back in the range of absolute net ads that we saw during the first three quarters of 2014. So we're in a great place there. And, again, I would stress that it's seasonality, a return to organic growth, ***and product initiatives***, all taken together.

40.     The statements issued on February 5, 2015 were false and misleading when made because the Individual Defendants concealed material adverse facts that they knew and deliberately disregarded, including that: (a) new product initiatives were not actually having a meaningful impact on MAUs; (b) the "acceleration [in MAU growth]" was the result of low-quality MAU growth, whereby new users were not as engaged as pre-existing users; (c) by early 2015, daily active users ("DAUs") had replaced the timeline views as the metric as the primary user engagement metric tracked internally by Twitter management; and (d) by early 2015, the trend in user engagement growth (*i.e.*, DAUs) was flat or declining.

41.     The market responded favorably to the foregoing false and misleading statements, as Twitter's stock price rose nearly 17% in one day to close at $48.01 per share on February 6, 2015, on volume of 102 million shares.

42.     On March 2, 2015, the Individual Defendants caused the Company to file an annual report on Form 10-K with the SEC, for fiscal year ended December 31, 2014 (the "2014 10-K").  The 2014 10-K, which was signed by Defendants Costolo, Noto, Dorsey, Fenton, Rosenblatt, Scardino, and Williams, described the "Key Metrics" used by Twitter to evaluate its business, growth and performance, including MAUs:

**Key Metrics**

We review a number of metrics, including the following key metrics, to evaluate our business, measure our performance, identify trends affecting our business, formulate business plans and make strategic decisions.

---

[1] Emphasis added unless otherwise noted throughout. The statements made or authorized by the Individual Defendants that ***are bolded and italicized*** are the statements alleged to be false and misleading. Additional statements are **bolded** (and not italicized) for emphasis.

*Monthly Active Users (MAUs).* We define MAUs as Twitter users who logged in or were otherwise authenticated and accessed Twitter through our website, mobile website, desktop or mobile applications, SMS or registered third-party applications or websites in the 30-day period ending on the date of measurement. Average MAUs for a period represent the average of the MAUs at the end of each month during the period. MAUs are a measure of the size of our active user base. In the three months ended December 31, 2014, we had 288 million average MAUs, which represents an increase of 20% from the three months ended December 31, 2013. The growth in average MAUs was driven primarily by organic growth and growth initiatives. In the three months ended December 31, 2014, we had 63 million average MAUs in the United States and 225 million average MAUs in the rest of the world, which represent increases of 17% and 21%, respectively, from the three months ended December 31, 2013. For additional information on how we calculate MAUs and factors that can affect this metric, see the section titled "Note Regarding Key Metrics."

**Monthly Active Users: Worldwide**
(quarterly average in millions)

43.     The 2014 10-K also discussed timeline views, which the Individual Defendants claimed was no longer "a helpful metric for measuring user engagement," as well as "an unrepresentative measure of user engagement with our platform."  The 10-K stated in relevant part:

*Timeline Views, Timeline Views Per MAU and Advertising Revenue Per Timeline View.* We define timeline views as the total number of timelines requested and delivered when registered users visit Twitter, refresh a home timeline (but not

11

other timelines) or view search results while such user is logged in or is otherwise authenticated on our website, mobile website or desktop or mobile applications (excluding our TweetDeck and Mac clients, as we do not fully track this data). We believe that timeline views going forward will not be a helpful metric for measuring user engagement because the ongoing optimization of our products has reduced the number of times a user needs to request a timeline view, which has resulted in timeline views becoming an unrepresentative measure of user engagement with our platform. We do not intend to report timeline views metric in future filings but we present it here for historical purposes. Timeline views per MAU are calculated by dividing the total timeline views for the period by the average MAUs for the last three months of such period. In the three months and year ended December 31, 2014, we had 182.0 billion and 692.5 billion timeline views, respectively, which represent increases of 23% and 17% from the three months and year ended December 31, 2013, respectively. In the three months and year ended December 31, 2014, we had 49.2 billion and 191.1 billion timeline views in the United States, respectively, which represent increases of 20% and 16% from the three months and year ended December 31, 2013, respectively. In the three months and year ended December 31, 2014, we had 132.8 billion and 501.3 billion timeline views in the rest of the world, respectively, which each represent an increase of 24% and 17% from the three months and year ended December 31, 2013, respectively. In the three months ended December 31, 2014, we had 631 timeline views per MAU, which represents an increase of 3% from the three months ended December 31, 2013. In the three months ended December 31, 2014, we had 778 timeline views per MAU in the United States and 590 timeline views per MAU in the rest of the world, which represent increases of 3% from the three months ended December 31, 2013. For additional information on how we calculate the number of timeline views and factors that can affect this metric, see the section titled "Note Regarding Key Metrics."

44.     In the section of the 2014 Form 10-K entitled "NOTE REGARDING KEY METRICS," the Individual Defendants again emphasized that timeline views were no longer an important metric:

We present and discuss timeline views in this Annual Report on Form 10-K. We have estimated a small percentage of timeline views in the three months ended September 30, 2013 to account for certain timeline views that were logged incorrectly during the quarter as a result of a product update. We believe this estimate to be reasonable, but the actual numbers could differ from our estimate. Additionally, the ongoing optimization of our products has reduced the number of times a user needs to request a timeline view. As a result, our management team believes timeline views have become an unrepresentative measure of, and will not use them internally to measure for, user engagement on our platform. As we announced on November 12, 2014, we do not intend to disclose timeline views for any future period. They are presented here only for historical purposes.

45.     In the section of the 2014 Form 10-K entitled "NOTE REGARDING KEY METRICS," the Individual Defendants again emphasized that timeline views were no longer an important metric:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

46.     The 2014 Form 10-K filing included signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Costolo and Noto, each certifying that:

1. I have reviewed this Annual Report on Form 10-K of Twitter, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

13

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

47.     On April 13, 2015, after the filing of the 2014 10-K, the SEC sent a letter to Twitter requesting additional information on the Company's statements concerning timeline views.  Specifically, the SEC requested the Company to provide alternative metrics to explain trends in user engagement, as follows:

We note your disclosures relating to Timeline Views, Timeline Views per Monthly Active User (MAU), and Advertising Revenue Per Timeline. We also note on page 46 that going forward you intend to cease presenting timeline views in future filings. Please address the following:

● **Please describe the alternative metric(s) you anticipate presenting in future filings to explain trends in user engagement** and advertising services revenue. Also, please describe your reasons for choosing such metric(s).

48.     On May 11, 2015, the Individual Defendants caused Twitter to respond to the SEC inquiry with a letter, which explained, among other things, that the Company's management was using alternative metrics to internally track user engagement:

The Company respectfully advises the Staff that it has included two metrics, changes in ad engagements and changes in cost per ad engagement, on page 25 in the Key Metrics section of its Quarterly Report on Form 10-Q for the quarter ended March 31, 2015, filed on May 11, 2015 (the "Form 10-Q"). These metrics are intended to serve as a measure of user engagement and demand, respectively, on the Company's platform. Ad engagements measure user interactions with the Company's Promoted Products and include expanding, retweeting, favoriting or replying to a Promoted Tweet, playing an embedded video, downloading a promoted mobile application or opting in to further communications from an advertiser in a Promoted Tweet, following the account that tweets a Promoted Tweet or following a Promoted Account. Therefore, changes in ad engagements indicate trends in user engagement and, in particular, user engagement with ads, which affects revenue. Changes in cost per ad engagements reflect the changes in the average cost per ad engagement in the period discussed.

The Company's management internally tracks changes in ad engagements and cost per ad engagement on the Twitter platform to monitor trends in user engagement and advertising services revenue and believes these metrics are helpful to investors to understand the same. The Company uses changes in ad engagements and cost per ad engagements to assess drivers for monetization on its platform in its Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"). In addition, the Company believes the metrics may be a helpful comparison of the Company's performance against other companies in its market, which also report changes in engagements with advertisements on their platforms.

The Company notes that while it provides a qualitative discussion of the changes to its advertiser base for additional context about growth in revenue, the Company does not manage its business based on the number of advertisers or revenue per advertiser. Therefore, the Company does not believe disclosing the number of advertisers or revenue per advertiser would be material to investors' understanding of the Company's advertising services revenue. While having more advertisers bidding on the Company's Promoted Products can result in increased revenue, disclosing the number of advertisers on the platform is not necessarily indicative of the health of the Company's advertising services revenue. For example, the Company could gain one large brand advertiser in a period that spends significantly more than all of the new small business advertisers in that same period. In addition, specifically quantifying advertisers for purposes of regular quarterly disclosures would require the Company to undertake new procedures and define counting conventions, which it does not currently do, relating to multiple advertisers working through the same advertising agency and multiple advertising brands that are part of one legal entity or group; providing specific and reliable information regarding the number of advertisers in a timely way at the Company's scale is not practical.

49.     Statements in the 2014 10-K filed with the SEC on March 2, 2015 were false and misleading when made because the Individual Defendants concealed adverse facts that they knew and deliberately disregarded, including that: (a) by early 2015, the Company was tracking DAUs rather than timeline views as the primary user engagement metric; and (b) by early 2015, the Company's metrics showed that user engagement growth was either flat or declining.

50.     Furthermore, statements in the May 11, 2015 letter that the Individual Defendants caused to be sent to the SEC were false and misleading when made because the ad engagement metric, which the Individual Defendants represented would be "helpful to investors to understand" and "monitor trends in user engagement," was a monetization metric rather than a user engagement metric.  The trend in "ad engagements" was not indicative of trends in user engagement.   In fact, the trend in "ad engagements" was moving in the opposite direction (*i.e.*, increasing) from the trend in user engagement.

51.     On April 20, 2015, the Individual Defendants caused Twitter to file a Proxy Statement pursuant to Section 14(a) of the Exchange Act ("2015 Proxy"). The 2015 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for election.  However, the 2015 Proxy misrepresented and/or failed to disclose that: (i) new product initiatives were not creating meaningful growth in MAUs or user engagement; (ii) the reported growth in MAUs was the

result of increased numbers of low-quality MAUs who were less engaged than existing Twitter users; (iii) by early 2015, the Company was tracking DAUs rather than timeline views as the primary user engagement metric; (iv) by early 2015, the Company's metrics showed that user engagement growth was flat or declining; and (v) as a result of the foregoing, Twitter's public statements were materially false and misleading at all relevant times.

52.     On April 28, 2015, the Individual Defendants caused Twitter to issue a press release and file a current report on Form 8-K with the SEC announcing the Company's financial and operating results for the first quarter of 2015 ended March 31, 2015 ("Q1 2015").  For Q1 2015, Twitter reported non-GAAP net income of $47 million, or $0.07 per diluted share, on revenue of $436 million.  Twitter also reported that MAUs increased only 5% in the quarter, including 3% growth in U.S. MAUs, and lowered the Company's full year revenue forecast to between $2.17 billion and $2.27 billion, from prior guidance of $2.3 billion to $2.35 billion.  The press release stated in part:

> Twitter's first quarter revenues were affected by a lower-than-expected contribution from its newer direct response products. The Company expects this revenue impact to continue for the remainder of the fiscal year as outlined in the outlook section below.
>
> "While we exceeded our EBITDA target for the first quarter, revenue growth fell slightly short of our expectations due to lower-than-expected contribution from some of our newer direct response products," said Dick Costolo, CEO of Twitter.  "It is still early days for these products, and we have a strong pipeline that we believe will drive increased value for direct response advertisers in the future. We remain confident in our strategy and in Twitter's long-term opportunity, and our focus remains on creating sustainable shareholder value by executing against our three priorities: strengthening the core, reducing barriers to consumption and delivering new apps and services."

53.     On the same day, the Individual Defendants caused Twitter to host a conference call with analysts and investors, during which Defendant Noto addressed questions concerning various metrics used by the Company:

> [Peter Stabler–Wells Fargo Securities]:  Thanks for taking the question. I guess, one for Dick and one for Anthony. Fully appreciate, I think all of us do that the timeline view metric had fully outlived its usefulness and that's great. Just wondering if you have any thoughts on how we should be thinking about monitoring engagement going forward? That's first one. And then secondly, with regard to your own analytics and measurement products, wondering if you could step back and give yourself a self-evaluation, where you think you are in the

development curve of analytics on your own platform and what could we expect from a product development cycle going forward this year? Thank you.

[Defendant Noto]:  Sure. In terms of engagement metrics, *there is a lot of different metrics that we look at internally. There is not one metric for engagement*. And so I can give you a sense of some of them and quite frankly, we *would like to be able to give you more visibility in this*, but there is just a number of different measurement. So DAU is one measurement of engagement. We talked about that at Analyst Day. It's a measurement that is dependent by market and you can have mix shift. So it could be a little bit misleading, but DAU to MAU ratios in the quarter were similar to what they were by market relative to Analyst Day.

Other engagement metrics that we look at are tweets per day, favorites and retweets, direct messages, searches. Our number of searches actually accelerated on year-over-year growth basis in the quarter. Direct messages also accelerated on a year-over-year basis in the quarter. Favorite and retweets had strong growth and we had growth in tweets per day as well. So those metrics all were generally positive.

*The timeline view metric, we don't look at internally.* It is a metric that we are doing things that actually hurt it and that was one of the reasons why we eliminated it. So we continue to look for metrics that could be helpful to you and we will try to give you color from time to time across these different metrics. *But there is not one, the all-in metric.*

54.     Following April 28, 2015 press release and conference call, the price of Twitter stock dropped $9.39 per share to close at $42.27 per share that day, a decline of 18%.  On the following day, April 29, 2015, the price of Twitter stock dropped again, falling $3.78 per share to close at $38.49 per share, a one-day decline of nearly 9% on volume of more than 120 million shares.

55.     However, the positive statements made by Twitter's senior management about active users and new product features kept the price of the stock from dropping further. In particular, Defendants Costolo and Nolo made the following statements during the April 28, 2015 conference call:

[Costolo:] I talked last quarter about the experiments we were running to test instant timelines. *The results during our experiment were quite positive in terms of engagemen*t . . . .

[Noto:] *We are very encouraged by the growth we've experienced thus far*, but as often is the case with new products, we have a great deal of iterating and fine-tuning to do as we scale in order to maximize the effectiveness of these products in our complex marketplaces.

17

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

56.     The statements made on April 28, 2015 were materially false and misleading when made because the Individual Defendants concealed material adverse facts they knew or deliberately disregarded, including that: (a) DAUs had become the primary user engagement metric tracked internally by Twitter management; (b) the trend in user engagement growth (*i.e.*, DAU growth) was flat or declining; and (c) new product initiatives were not effective at increasing user engagement or MAU growth.

57.     On May 11, 2015, the Individual Defendants caused Twitter to file a quarterly report on Form 10-Q with the SEC, reiterating the financial and operating results stated in the press release for the first quarter of fiscal year 2015 (the "Q1 2015 10-Q").  The Q1 2015 10-Q included the following statements:

**Key Metrics**

We review a number of metrics, including the following key metrics, to evaluate our business, measure our performance, identify trends affecting our business, formulate business plans and make strategic decisions:

*Monthly Active Users (MAUs)*. We define MAUs as Twitter users who logged in or were otherwise authenticated and accessed Twitter through our website, mobile website, desktop or mobile applications, SMS or registered third-party applications or websites in the 30-day period ending on the date of measurement. Average MAUs for a period represent the average of the MAUs at the end of each month during the period. MAUs are a measure of the size of our active user base. In the three months ended March 31, 2015, we had 302 million average MAUs, which represents an increase of 18% from the three months ended March 31, 2014. The growth in average MAUs was driven primarily by organic growth and growth initiatives. In the three months ended March 31, 2015, we had 65 million average MAUs in the United States and 236 million average MAUs in the rest of the world, which represent increases of 15% and 19%, respectively, from the three months ended March 31, 2014.

/ / /

/ / /



Given our prioritization of growth in emerging markets, we are delivering a more complete product experience to SMS Fast Followers, which are users who sign-up and access Twitter solely via SMS, and will be including SMS Fast Followers as part of our total MAU count going forward. MAUs including SMS Fast Followers would have been 258 million, 274 million, 287 million, 292 million, and 308 million average MAUs in the three month periods ending March 31, 2014, June 30, 2014, September 30, 2014, December 31, 2014, and March 31, 2015, respectively. MAUs including SMS Fast Followers in the United States would have been 57 million, 60 million, 64 million, 64 million, and 66 million average MAUs in the three months ending periods ending March 31, 2014, June 30, 2014, September 30, 2014, December 31, 2014, and March 31, 2015, respectively. MAUs including SMS Fast Followers in the rest of the world would have been 201 million, 214 million, 224 million, 229 million, and 242 million average MAUs in the three months ending periods ending March 31, 2014, June 30, 2014, September 30, 2014, December 31, 2014, and March 31, 2015, respectively.

58.     The Q1 2015 Form 10-Q contained signed certifications pursuant to SOX by Defendants Costolo and Noto similar to the certifications in ¶ 46.

59.     The statements in the Q1 201 10-Q were materially false and misleading when made because the Individual Defendants concealed adverse facts they knew or deliberately disregarded, including that: (a) DAUs had become the primary user engagement metric tracked internally by Twitter management; and (b) the trend in user engagement growth (*i.e.*, DAU growth) was flat or declining.

60.     On June 11, 2015, the Individual Defendants caused Twitter to issue a press release and file a current report on Form 8-K with the SEC announcing that Defendant Costolo had "decided to step down as Chief Executive Officer of Twitter, effective July 1, 2015," and that the Board had named Dorsey as interim CEO.

61.     On June 12, 2015, an article in *Fortune* titled "Where Did Dick Costolo Go Wrong?" described Costolo's failures, including his efforts to "shift the narrative on user growth," as follows:

> Costolo failed at doing the things that protect a stock price, too. Twitter doubled its revenues every year it was a public company, which is an impressive feat. But it never turned a profit, which is what investors demanded.
>
> Worse, **Twitter lost its magic ability to lure in new users—the very thing that propelled it through its rocky early years. Costolo even tried to shift the narrative on user growth, pointing to the number of people who see Tweets embedded around the Web (500 million)** instead of how many people actually use Twitter (just under 300 million). The company announced plans to begin monetizing those "logged-out" users.
>
> **Investors didn't buy the strategy. It's not clear even Costolo bought it. Before his resignation this week, Costolo offered to resign last November, and again in February, he said on a media call Thursday.  The third time, the Board agreed**.

62.     On July 28, 2015, Twitter's stock closed at $36.54 per share.

63.     As a result of the Individual Defendants' false and misleading statements and omissions, Twitter shares traded at artificially inflated prices during the Relevant Period.

## REASONS STATEMENTS WERE IMPROPER

64.     The true facts, which were known or recklessly disregarded by the Individual Defendants, but were concealed from the investing public, were as follows:

(a)     Twitter's new product initiatives were not creating meaningful growth in MAUs or user engagement;

(b)     The Company's reported growth in MAUs was the result of increased numbers of low-quality MAUs who were less engaged than existing Twitter users;

(c)     By early 2015, the Company was tracking DAUs rather than timeline views as the primary user engagement metric;

(d)      By early 2015, the Company's metrics showed that user engagement growth was flat or declining; and

(e)      As a result of the foregoing, the Company's touted financial and business prospects were materially false and misleading at all relevant times.

**THE TRUTH BEGINS TO EMERGE**

65.      On July 28, 2015, the truth about the Individual Defendants' false and misleading statements regarding the Company's sales user growth rate and user engagement began to emerge.  On that date, the Individual Defendants caused the Company to issue a press release announcing the Company's second quarter 2015 financial results, revealing that Twitter's MAUs had increased by only 2 million users over the prior quarter, representing slight growth of less than 1%.  The press release included the following statements:

> "Our Q2 results show good progress in monetization, but we are not satisfied with our growth in audience," said Jack Dorsey, interim CEO of Twitter.  "In order to realize Twitter's full potential, we must improve in three key areas: ensure more disciplined execution, simplify our service to deliver Twitter's value faster, and better communicate that value."

> *          *          *

> Monthly Active Users – Average Monthly Active Users (MAUs) were 316 million for the second quarter, up 15% year-over-year, and compared to 308 million in the previous quarter. The vast majority of MAUs added in the quarter on a sequential basis came from SMS Fast Followers. Excluding SMS Fast Followers, **MAUs were 304 million for the second quarter, up 12% year-over-year, and compared to 302 million in the previous quarter.** Mobile MAUs represented approximately 80% of total MAUs.

66.      After issuing the press release, Twitter held a conference call, during which Defendant Noto explained that the Company was experiencing "very low" user growth and would continue to experience low use growth in the foreseeable future.  Defendant Dorsey, who had just been appointed Twitter's interim CEO, also revealed that the Company's highly-touted product initiatives were not having a "meaningful impact" on user growth.  The conference call included the following statements:

> [Defendant Noto]: **[I]n the near term, our organic growth is going to be very low, as it was this quarter** and as I think about Q3, it's marginally better.  But I wouldn't want you to or anyone else to expect change in our growth rate relative to what you're seeing this quarter.  **I think you'll see that for a while,** and that was my point.

21

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1                                      *        *        *

2    [Defendant Dorsey]:   **[P]roduct initiatives we've mentioned in previous
     earnings calls**, like instant timelines and logged out experiences, **have not yet
3    had meaningful impact on growing our audience or participation**. This is
     unacceptable. . . .
4
                                       *        *        *
5

6    [Noto]:  Now, turning to our audience. As I noted throughout the quarter, MAUs
     in Q2 did not benefit from the same factors that benefited Q1. **Specifically, we
7    did not see organic growth, positive seasonality, or growth initiatives seen in
     Q1**. We reached 304 million MAUs in Q2 excluding SMS Fast Followers,
8    compared to 302 million MAUs in Q1, for a growth rate of 12% on a year over
     year basis.

9                                      *        *        *

10   We are working as rapidly as possible to be in a position to launch an integrated
     marketing strategy and campaign before the end of 2015. We have also begun the
11   process of hiring a CMO and are encouraged by the quality of candidates that
     we're in dialogue with today.
12
     **To be clear, however, we do not expect to see sustained meaningful growth in
13   MAUs until we start to reach the mass market. We expect that will take a
     considerable period of time**. What I can tell you today, though, is we will be
14   bolder, move faster, and raise the bar in everything we do to unlock value for
     shareholders by ensuring disciplined execution.
15
     Now, before moving on to our outlook, I wanted to provide an update on some
16   key data points as it relates to the long term opportunities we discussed at our
     analyst day.
17

18   •   First, DAU/MAU for our top 20 markets in Q2 2015 was approximately 44%,
         vs the 48% we shared with you at our Analyst Day which is for the first three
19       quarters of 2014.

20   •   Second, Ad load, as measured by total ad impressions divided by total tweet
         impressions, is approximately one third of what we see as the long term
21       potential.

22   •   Third, since going public, our revenue growth has primarily been driven by
         increased users and increased monetization via increased load factor. During
23       this period, supply has been greater than demand. However, over time we
         recognize that if we do not grow audience, drive increased engagement, or
24       begin to monetize other areas such as logged out, it is possible that on some
         days our revenue could be impacted by limited available inventory for specific
25       ad types.

26           67.     The market responded negatively to these revelations, resulting in a substantial

27   sell-off of Twitter stock.  Indeed, the Company's stock prices declined nearly 15% in one day,

28

                                             22

falling $5.30 per share to close at $31.24 on July 29, 2015, resulting in a loss of hundreds of millions of dollars in market capitalization.

68.     In September 2016, multiple media sources reported on the possible sale of Twitter, with potential interest from major companies including Google, Disney, and Apple.  On that news, the stock price rose sharply, reaching a share price of $24.87 on October 5, 2016.

69.     However, on October 5, 2016, the tech journalism site *Recode* reported that the foregoing companies had declined to move forward with an acquisition of Twitter.  Moreover, as explained by an investment analyst from Oppenheimer Holdings Inc., in an article posted on the *Silicon Valley Business Journal* website on October 6, 2016, Twitter presented a "poor acquisition target" due to problems including dismal user growth and poor product implementation, among other things:

> Google and Apple will reportedly not make a bid on Twitter.
>
> Google was seen as one of the most likely the buyers of the social media site, but sources close to the deal said the Mountain View-based company is no longer interested, according to Recode. Twitter stock was down more than 9 percent on the news in after-hours trading.
>
> Several other sources told Recode that Apple was also unlikely to make a bid. One source noted that Twitter should maintain "low expectations" of an offer from a major tech company. Disney also will not make a bid on Twitter after consideration, according to a separate Recode report.
>
> \*          \*          \*
>
> Twitter recently told potential buyers it plans to conclude negotiations on selling the company by its third-quarter earnings report on Oct. 27, people familiar with the matter told Reuters.
>
> Twitter has more than 313 million monthly active users, **but investors and analysts are skeptical the platform could bring much value to a bidder**. Oppenheimer Holdings Inc., analyst Jason Helfstein wrote in a note to investors last week that **Twitter would make a poor acquisition target "based on slowing user growth, poor product implementation/execution, decreasing user engagement, inferior advertising technology, platform safety issues, and strong competition**."

70.     Due to the reports of Twitter's ongoing failure to increase user growth and poor product execution, the Company's stock price continued to decline, closing at $19.87 per share on October 6, 2016.  The Company's stock price has continued on its downward trajectory, closing at $16.73 per share on October 17, 2016.

**INSIDER SELLING**

71.     Not all stockholders were harmed by the Individual Defendants' actions.  Indeed, during the Relevant Period, while in possession of material, adverse, non-public information, certain of the Individual Defendants unloaded their holdings of Twitter stock at bloated prices. Specifically, the Insider Selling Defendants (including Director Defendants Dorsey and Williams) took advantage of the artificially inflated prices to sell their Twitter shares for substantial proceeds.  As detailed below, these Insider Selling Defendants sold **more than $291 million** of personally held common stock.

72.     Defendant Dorsey is Twitter's CEO and a current member of the Company's Board, and also served as Chairman of the Board during the Relevant Period.  Dorsey was aware of material, non-public information regarding the inaccuracy of the Company's statements in press releases and public filings, as well as those made by other senior executives at Twitter. While in possession of this information, on February 6, 2015 the first day of the Relevant Period, Dorsey sold at least 75,090 personally held shares of Twitter stock at artificially inflated prices ($46.52-$48.17 per share) for proceeds of approximately $3,604,651.67.  Dorsey's sales were timed to maximize profits from the Company's then artificially inflated stock price.

73.     Defendant Costolo was a member of the Company's Board, as well as CEO, during the Relevant Period.  During the Relevant Period, Costolo was aware of material, non-public information regarding the inaccuracy of his own statements, the statements made by other senior executives, and the Company's statements in press releases and public filings.  While in possession of this information, Costolo sold at least 77,009 personally held shares of Twitter stock at artificially inflated prices for proceeds of approximately **$3 million**.  Costolo's sales were timed to maximize profits from the Company's then artificially inflated stock price, including the following sales:

(a)     On April 1, 2015, Costolo sold 18,845 shares at $50.92 per share, generating personal proceeds of approximately $959,499.

(b)     On July 1, 2015, Costolo sold 58,164 shares at $35.56 per share, generating proceeds of approximately $2,068,155.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

74.     Defendant Williams is a co-founder of the Company and currently a member of the Board.  During the Relevant Period, Williams was aware of material, non-public information regarding the inaccuracy of the statements made by senior executives at Twitter and the Company's statements in its press releases and public filings.   While in possession of this information, Williams sold **more than 6 million** personally held shares of Twitter stock at artificially inflated prices for proceeds of more than ***$274 million***.  Williams's sales were timed to maximize profits from the Company's then artificially inflated stock price, including the following sales:

(a)     On February 18, 2015, Williams sold 618,000 shares at approximately $48.00 per share, generating personal proceeds of approximately $29,669,632.

(b)     On February 19, 2015, Williams sold 234,000 shares at approximately $48.00 per share, generating proceeds of approximately $11,244,598.

(c)     On February 25, 2015, Williams sold 234,000 shares at approximately $48.60 per share, generating proceeds of approximately $11,380,256.50.

(d)     On May 29, 2015, Williams sold 359,128 shares at $36.72 per share, generating proceeds of approximately $13,187,862.50.

(e)     On November 30, 2015, Williams sold 1,848,342 shares at $25.25 per share, generating proceeds of approximately $46,675,626.

75.     Alexander Roetter ("Roetter") is not a defendant in this case.  Roetter served as Senior Vice President of Engineering from May 2014 to February 4, 2016.  During the Relevant Period, Roetter was aware of material, non-public information regarding the inaccuracy of the statements made by other senior executives at Twitter and the Company's statements in press releases and public filings.  While in possession of this information, Roetter sold at least 121,253 personally held shares of Twitter stock at artificially inflated prices for proceeds of more than **$5.2 million**.   Roetter's sales were timed to maximize profits from the Company's then artificially inflated stock price.

76.     Kevin Weil ("Weil") is not a defendant in this case.  Weil served as Senior Vice President of Product from October 2014 to January 29, 2016.  During the Relevant Period, Weil

1  was aware of material, non-public information regarding the inaccuracy of the statements made

2  by other senior executives at Twitter and the Company's statements in press releases and public

3  filings.  While in possession of this information, Weil sold at least 119,835 personally held

4  shares of Twitter stock at artificially inflated prices for proceeds of more than **$4.9 million**.

5  Weil's sales were timed to maximize profits from the Company's then artificially inflated stock

6  price.

7       77.    The foregoing insider sales, which resulted in total proceeds of more than

8  $291 million, are summarized in the following chart. These insider sales were executed under

9  highly suspicious circumstances and occurred while the Company's stock price was artificially

10  inflated due to the misrepresentations and omissions alleged herein.

| Insider | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Dorsey | February 6, 2015 | 23,701 | $48.17 | $1,141,558.67 |
| | February 6, 2015 | 12,100 | $46.52 | $562,927.09 |
| | February 6, 2015 | 39,829 | $47.71 | $1,900,165.91 |
| | **TOTAL** | **75,630** | | **$3,604,651.67** |
| Williams | February 18-26, 2015 | 1,319,900 | $47.88-49.88 | $63,882,358.41 |
| | March 5-17, 2015 | 965,016 | $41.62-48.33 | $45,308,630.94 |
| | April 1-24, 2015 | 1,404,000 | $50.22-51.78 | $71,749,522.25 |
| | May 20-29, 2015 | 1,103,128 | $36.37-37.82 | $40,536,342.77 |
| | June 9-23,2015 | 744,000 | $35.57-36.14 | $26,612,814.86 |
| | July 8-22, 2015 | 744,000 | $34.66-36.74 | $26,444,961.81 |
| | **TOTAL** | **6,280,044** | | **$274,534,631.04** |
| Costolo | April 1, 2015 | 18,845 | $50.92 | $959,498.83 |
| | July 1, 2015 | 58,164 | $35.56 | $2,068,154.80 |
| | **TOTAL** | **77,009** | | **$3,027,653.63** |
| Roetter | March 3, 2015 | 12,252 | $48.11 | $589,500.08 |
| | April 1-7, 2015 | 42,071 | $50.92-53.09 | $2,180,325.11 |
| | May1-18, 2015 | 21,172 | $37.21-37.69 | $792,259.05 |
| | June 2-5, 2015 | 19,045 | $36.43-37.00 | $697,567.62 |
| | July 1-7,2015 | 26,713 | $35.50-35.56 | $949,451.16 |
| | **TOTAL** | **121,253** | | **$5,209,103.02** |
| Weil | March 3-18, 2015 | 13,027 | $46.49-48.34 | $615,213.93 |
| | April 1-29, 2015 | 36,063 | $39.35-51.33 | $1,796,350.45 |
| | May 1-29, 2015 | 28,622 | $36.74-37.53 | $1,069,467.39 |
| | June 2-29, 2015 | 14,559 | $34.74-36.41 | $512,922.66 |
| | July 1-15, 2015 | 27,564 | $35.56-36.78 | $983,891.05 |
| | **TOTAL** | **119,835** | | **$4,977,845.48** |
| **TOTAL INSIDER SALES** | | | | **$291,353,884.84** |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Fiduciary Duties**

78.     By reason of their positions as officers, directors, and/or fiduciaries of Twitter and because of their ability to control the business and corporate affairs of Twitter, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Twitter in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Twitter and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

79.     Each director and officer of the Company owes to Twitter and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

80.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Audit Committee Duties**

81.     In addition to these duties, the members of the Audit Committee owed specific duties to Twitter under the Audit Committee's Charter to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

82.     According to Twitter's Audit Committee Charter, the purpose of the Audit Committee is to assist the Board in fulfilling its responsibilities for overseeing:

- The Company's accounting and financial reporting processes and internal control over financial reporting, as well as the audit and integrity of the Company's financial statements.

- The qualifications, independence and performance of the Company's registered public accounting firm (the "independent auditor").

- The performance of the Company's internal audit function, as required by applicable rules.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- The Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements).

- Risk assessment and risk management.

- Prepare the report of the Audit Committee required by the rules of the SEC.

83.    Specifically, according to Twitter's Audit Committee Charter, the Audit Committee's responsibilities include the following:

- Select and Hire the Independent Auditor. The Audit Committee shall be directly responsible for appointing, compensating, retaining, overseeing and, where appropriate, replacing the independent auditor. The independent auditor will report directly to the Audit Committee. The Audit Committee has sole authority to approve the hiring and discharging of the independent auditor, all audit engagement fees and terms and all permissible non-audit engagements with the independent auditor. The Audit Committee will also appoint, retain, compensate, oversee and, where appropriate, replace any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company.

- Supervise and Evaluate the Independent Auditor. The Audit Committee will:

  o    Oversee and, at least annually, evaluate the work of the independent auditor or any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, which evaluation shall include a review and evaluation of the lead partner of the independent auditor. The Audit Committee shall review, in consultation with the independent auditor, the annual audit plan and scope of audit activities and monitor such plan's progress.

  o    Review and resolve any disagreements that may arise between management and the independent auditor regarding internal control over financial reporting or financial reporting.

  o    At least annually, obtain and review a report by the independent auditor that describes (i) the independent auditor's internal quality control procedures, and (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the independent auditor or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, regarding any independent audit performed by the independent auditor, and any steps taken to deal with any such issues.

- **Evaluate the Independence of the Independent Auditor**. The Audit Committee will:

  o Review and discuss with the independent auditor the written independence disclosures required by the applicable requirements of the Public Company Accounting Oversight Board or other regulatory body.

  o Review and discuss with the independent auditor at least annually any relationships or services (including permissible non-audit services) that may affect its objectivity and independence.

  o Oversee the rotation of the independent auditor's lead audit and concurring partners and the rotation of other audit partners, with applicable time-out periods, in accordance with applicable law.

  o Take appropriate action to oversee the independence of the independent auditor.

- **Approve Audit and Non-Audit Services and Fees**. The Audit Committee shall (i) review and approve, in advance, the scope and plans for the audits and the audit fees and (ii) approve in advance (or, where permitted under the rules and regulations of the SEC, subsequently) all non-audit and tax services to be performed by the independent auditor that are not otherwise prohibited by law or regulations and any associated fees. The Audit Committee shall also approve all audit and permitted non-audit and tax services that may be provided by other registered public accounting firms. The Audit Committee may, in accordance with applicable law, establish pre-approval policies and procedures for the engagement of independent accountants and any other registered public accounting firm to render services to the Company.

- **Review Financial Statements**. The Audit Committee shall review and discuss the following with management, the internal auditors, if applicable, and the independent auditor, as applicable:

  o The scope and timing of the annual audit of the Company's financial statements.

  o The Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K.

  o The results of the independent audit and the quarterly reviews of the Company's financial statements, and the independent auditor's opinion on the audited financial statements.

  o The reports and certifications regarding internal control over financial reporting and disclosure controls and procedures.

29

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

o     Major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles.

o     Analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

o     The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

o     Any significant changes required or taken in the audit plan as a result of any material control deficiency.

o     Any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and management's response.

o     Any significant disagreements between management and the independent auditor.

- **Reports and Communications from the Independent Auditor**. The Audit Committee shall review and discuss reports from the independent auditor concerning the following:

o     Critical accounting policies and practices to be used by the Company.

o     Alternative treatments of financial information within GAAP that the auditor has discussed with management, ramifications of the use of these alternative disclosures and treatments, and the treatment preferred by the independent auditor if different from that used by management.

o     Any material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

o     Any matters required to be communicated to the Audit Committee under generally accepted auditing standards and other legal or regulatory requirements.

- **Audit Committee Report**. The Audit Committee will prepare the report of the Audit Committee that SEC rules require to be included in the Company's annual proxy statement.

- **Earnings Press Releases and Earnings Guidance**. The Audit Committee will review, in general, earnings press releases, and review and discuss with management and the independent auditors policies with respect to earnings press releases (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), financial information and earnings guidance provided to the public, analysts and ratings agencies.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- <u>Internal Controls</u>. The Audit Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the internal auditors, if applicable, or management and any special audit steps adopted in light of any material control deficiencies, and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

- <u>Disclosure Controls and Procedures</u>. The Audit Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures.

- <u>Internal Audit</u>. The Audit Committee shall:

  - Review with the independent auditor a discussion of management's plans with respect to the responsibilities, budget and staffing of the internal audit function and the Company's plans for the implementation of the internal audit function.

- <u>Legal and Regulatory Compliance</u>. The Audit Committee shall:

  - Review and discuss with management, the internal auditors, if applicable, and the independent auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Conduct & Ethics, compliance with anti-bribery and anti-corruption laws and regulations, and compliance with export control regulations and (ii) reports regarding compliance with applicable laws, regulations and internal compliance programs.

  - Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

  - Discuss with the Company's senior legal officer any legal matters that may have a material impact on the financial statements or the Company's compliance procedures.

- <u>Complaints</u>. The Audit Committee shall establish and oversee procedures for the receipt, retention and treatment of complaints on accounting, internal accounting controls or audit matters, as well as for confidential and anonymous submissions by the Company's employees concerning questionable accounting or auditing matters.

- <u>Risk Assessment and Risk Management</u>.  The Audit Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Related Party Transactions. The Audit Committee shall review and oversee all transactions between the Company and a related person (as defined in Item 404 of Regulation S-K), in accordance with the Company's policies and procedures.

- Hiring of Auditor Personnel. The Audit Committee shall set hiring policies with regard to employees and former employees of the independent auditor and oversee compliance with such policies.

- Committee Charter Review. The Audit Committee shall review and reassess the adequacy of this charter annually and shall submit any recommended changes to the charter to the Board for approval.

- Performance Review. The Audit Committee shall review and assess the performance of the Audit Committee on an annual basis.

- The function of the Audit Committee is primarily one of oversight. The Company's management is responsible for preparing the Company's financial statements, and the independent auditor is responsible for auditing and reviewing those financial statements. The Audit Committee is responsible for assisting the Board in overseeing the conduct of these activities by management and the independent auditor.   The Audit Committee is not responsible for providing any expert or special assurance as to the financial statements or the independent auditor's work. It is recognized that the members of the Audit Committee are not full-time employees of the Company, that it is not the duty or responsibility of the Audit Committee or its members to conduct "field work" or other types of auditing or accounting reviews or procedures or to set auditor independence standards, and that each member of the Audit Committee shall be entitled to rely on (i) the integrity of those persons and organizations within and outside the Company from which the Audit Committee receives information and (ii) the accuracy of the financial and other information provided to the Audit Committee, in either instance absent actual knowledge to the contrary.

84.     Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**Duties Pursuant to the Company's Code of Conduct and Ethics**

85.     Additionally, the Individual Defendants, as officers and/or directors of Twitter, are bound by the Company's Code of Business Conduct and Ethics (the "Code") which, according to the Code, includes guidelines developed "around the recognition that everything we do in connection with our work should be measured against the highest possible standards of ethical business conduct," among other things.  Twitter's employees, board members, officers, independent contractors, and consultants must follow the Code.

86.     According to the Code:

Financial integrity and fiscal responsibility is everyone's personal responsibility. The money we spend for Twitter is not ours; it belongs to the company's and, ultimately, our shareholders'. Each person at Twitter – not just those in Finance – has a role in making sure that money is appropriately spent, our financial records are complete and accurate and our internal controls are honored.  This matters every time we hire a new vendor, expense something to Twitter, sign a new business contract or enter into any deals on Twitter's behalf.

Twitter maintains a system of internal controls to reinforce our compliance with legal, accounting, tax and other regulatory requirements in every location in which we operate. Stay in compliance with our system of internal controls, and don't hesitate to contact Legal or Finance if you have any questions.

87.     Upon information and belief, the Company maintained a version of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Board as those set forth above.

**Control, Access, and Authority**

88.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Twitter, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Twitter.

89.     Because of their advisory, executive, managerial, and directorial positions with Twitter, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Twitter.

90.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Twitter, and was at all times acting within the course and scope of such agency.

**Reasonable And Prudent Supervision**

91.     To discharge their duties, the officers and directors of Twitter were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Twitter were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d)     remain informed as to how Twitter conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that Twitter was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

92.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Twitter and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Twitter, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Twitter, the absence of good faith on their part, and a reckless disregard for their duties to Twitter and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Twitter.

93.     The Individual Defendants each breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

94.     In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws.   As a result, Twitter has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

95.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.   The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

96.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

97.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

98.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.   Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and

substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

99.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO TWITTER

100.     As a result of the Individual Defendants' wrongful conduct, Twitter disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Twitter's credibility. Twitter has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

101.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Twitter's market capitalization has been substantially damaged, losing hundreds of millions of dollars in value as a result of the conduct described herein.

102.     Further, as a direct and proximate result of the Individual Defendants' conduct, Twitter has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred in investigating and defending Twitter and certain officers in the pending Securities Class Action, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

(b)     costs incurred by the Company in connection with the SEC investigation into its public disclosures;

(c)     costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Twitter's artificially-inflated stock price; and

1    (d)    costs incurred from the loss of the Company's customers' confidence in Twitter's

2        products.

3    103.    Moreover, these actions have irreparably damaged Twitter's corporate image and

4  goodwill.  For at least the foreseeable future, Twitter will suffer from what is known as the

5  "liar's discount," a term applied to the stocks of companies who have been implicated in illegal

6  behavior and have misled the investing public, such that Twitter's ability to raise equity capital

7  or debt on favorable terms in the future is now impaired.

8                  **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

9    104.    Plaintiff brings this action derivatively in the right and for the benefit of Twitter to

10  redress injuries suffered, and to be suffered, by Twitter as a direct result of the Individual

11  Defendants' breaches of fiduciary duties and unjust enrichment, as well as the aiding and

12  abetting thereof, by the Individual Defendants.  Twitter is named as a nominal defendant solely

13  in a derivative capacity.

14    105.    Plaintiff will adequately and fairly represent the interests of Twitter in enforcing

15  and prosecuting its rights.

16    106.    Plaintiff was a shareholder of Twitter common stock at the time of the

17  wrongdoing of which Plaintiff complains, and has been continuously since.

18    107.    Plaintiff did not make a pre-suit demand on the Board to pursue this action

19  because such a demand would have been a futile and wasteful act.

20    108.    At the time this action was commenced, the Board of Twitter was comprised of

21  the following ten (10) directors: Dorsey, Fenton, Kordestani, Rosenblatt, Scardino, and

22  Williams, and non-defendants Fox, Johnston, Lee, and Taylor.  A majority of these directors are

23  not disinterested and independent with respect to the acts and omissions alleged herein.  Notably,

24  at least half of the current board faces a substantial likelihood of personal liability for their

25  breaches of the duties of trust, loyalty, good faith, candor, oversight, reasonable inquiry,

26  supervision, and due care described herein.  Where a plaintiff alleges that at least half of the

27  members of the current board are not independent or disinterested, demand is excused as futile.

28  *See In re Bridgepoint Educ., Inc. S'holder Derivative Litig.*, 2014 U.S. Dist. LEXIS 148214, *26-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

27, 2014 WL 5325711 (S.D. Cal. Oct. 17, 2014), citing *Beam v. Stewart*, 845 A.2d 1040, 1046 n.8 (Del. 2004).

**Demand is Futile as to All Director Defendants Because the Director Defendants Face a Substantial Likelihood of Liability**

109.    The Director Defendants face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects were accurate.

110.    Indeed, Director Defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams each signed the false and misleading 2014 10-K.  The 2014 10-K was false and misleading because, *inter alia*, it misrepresented and/or failed to disclose that: (a) by early 2015, the Company was tracking DAUs rather than timeline views as the primary user engagement metric; (b) by early 2015, the Company's metrics showed that user engagement growth was either flat or declining; and (c) the ad engagement metric, which the Individual Defendants represented would be "helpful to investors to understand" and "monitor trends in user engagement," was a monetization metric rather than a user engagement metric.   As a result, the Director Defendants face a substantial likelihood of liability for their breaches of fiduciary duties, rendering demand upon them futile.

111.    Moreover, the Director Defendants as directors (and, in some cases, also as Audit Committee members) owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

112.    The Director Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors.  The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

113.    The Director Defendants' making or authorization of false and misleading statements during the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control, constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Twitter to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile.

**Demand is Futile as to the Audit Committee Defendants**

114.    The Audit Committee Defendants were responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing Twitter's internal controls over financial reporting, and discharging their other duties described herein.  Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press releases and earnings guidance, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient and that statements made by the Company regarding its business and financial prospects were accurate.  Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary

duties of loyalty and good faith.  Any demand upon the Audit Committee Defendants therefore is futile.

**Demand is Futile as to Defendant Dorsey and Director Kordestani for Additional Reasons**

115.    Demand is also futile as to Defendant Dorsey and Director Kordestani because, as the Company admits, neither Dorsey nor Kordestani meet the standards for director independence.

116.    Dorsey and Kordestani are currently employed at Twitter, respectively, as CEO and Executive Chairman, and as such, derive a substantial portion of their income from employment with Twitter.  For example, Kordestani received a whopping $12,361,615 in total compensation from Twitter in 2015, despite working there for less than three months.  This does not include the lucrative stock options and performance-based restricted stock units that were granted to Kordestani as part of his employment compensation package.  Because both Dorsey and Kordestani have financially benefitted from the wrongdoing of the Individual Defendants, and because both of their livelihoods continue to depend on their ongoing employment from Twitter, they are not independent and not disinterested.  Demand is therefore futile as to Dorsey and Kordestani.

**Demand is Futile Based on Insider Selling as to Defendants Dorsey and Williams**

117.    Demand is futile as to Defendants Dorsey and Williams because, as alleged herein, each engaged in insider trading activity at a time when each of them knew of adverse, material, non-public information about the Company's financial outlook that was not being disclosed to the shareholders.

118.    On the basis of this non-public information, Dorsey and Williams timed their sales to maximize profit from Twitter's then artificially inflated stock price.  As a result of their illicit insider sales, Dorsey and Williams each received direct financial benefits not shared with Twitter shareholders, and are, therefore, each directly interested in a demand.  In fact, Dorsey and Williams collectively reaped more than $278 million in proceeds from the sale of their personal stock holdings.  Further, defendants Dorsey and Williams each are interested in a demand because they face a substantial likelihood of liability for their breaches of fiduciary

1    duties of loyalty and good faith based on their challenged insider sales.  As such, demand upon

2    Dorsey and Williams is futile.

3    **Demand is Futile as to All Directors for Additional Reasons**

4           119.    The current Board of Twitter has already demonstrated that it cannot

5    independently and disinterestedly consider a pre-suit demand to bring the claims set forth herein.

6    Despite the wrongdoing of the Company's executive officers, including Defendant Noto, who

7    still serves as Twitter's CFO, the Board has taken no action to address the harm this misconduct

8    has caused to the Company.

9           120.    Each of the current directors receives a lavish annual retainer of approximately

10   $300,000 purely for being a Board member.  This compensation provides a substantial stipend to

11   these directors, from which each of them personally benefits and depends on for his or her

12   livelihood.  Demand on each of the directors is futile because, through their course of conduct to

13   date, they have demonstrated their unwillingness to undertake any action that would threaten the

14   economic benefits they receive as members of Twitter's Board.

15          121.    If Twitter's current officers and directors are protected against personal liability

16   for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability

17   Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their

18   protection with corporate funds, *i.e.*, monies belonging to the shareholders.  However, Plaintiff is

19   informed and believes that the D&O Insurance policies covering the Individual Defendants in

20   this case contain provisions that eliminate coverage for any action brought directly by Twitter

21   against the Individual Defendants, known as the "insured versus insured exclusion."

22          122.    As a result, if the members of Twitter's Board were to sue themselves or certain

23   officers of Twitter, there would be no D&O Insurance protection, and thus, this is a further

24   reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively,

25   as this action is brought, such insurance coverage exists and will provide a basis for the

26   Company to effectuate recovery.  Therefore, the members of the Board cannot be expected to file

27   the claims asserted in this derivative lawsuit because such claims would not be covered under the

28   Company's D&O Insurance policy.

123.    Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Twitter by prosecuting this action.  Therefore, demand on Twitter and its Board is futile and is excused.

124.    Twitter has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

125.    Plaintiff has not made any demand on shareholders of Twitter to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Twitter is a publicly traded company with thousands of shareholders of record and at least hundreds of thousands of beneficial owners;

(b)    Making demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of Twitter  shareholders; and

(c)    Making demand on all shareholders would force Plaintiff to incur excessive expenses and obstacles, assuming all shareholders could even be individually identified  with any degree of certainty.

**COUNT I**

**Against the Individual Defendants for Violations of
Section 14(a) of The Securities Exchange Act of 1934**

126.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, **in contravention of such rules and regulations as the [SEC] may prescribe** as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to

solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

128.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

129.    The Company's Proxy Statement violated Section 14(a) and Rule 14a-9 by misrepresenting or failing to disclose that: (i) Twitter's new product initiatives were not creating meaningful growth in MAUs or user engagement; (ii) the Company's reported growth in MAUs was the result of increased numbers of low-quality MAUs who were less engaged than existing Twitter users; (iii) by early 2015, the Company was tracking DAUs rather than timeline views as the primary user engagement metric; (iv) by early 2015, the Company's metrics showed that user engagement growth was flat or declining; and (v) as a result of the foregoing, Twitter's public statements were materially false and misleading at all relevant times.

130.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose these material facts, the statements contained in these Proxy Statements were materially false and misleading.  The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statement, including but not limited to, election of directors, approval of officer compensation, and appointment of independent auditor.

131.    The Company was damaged as a result of defendants' material misrepresentations and omissions in the Proxy Statement.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duties

132.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.   The Individual Defendants owed and owe Twitter fiduciary obligations.   By reason of their fiduciary relationships, the Individual Defendants owed and owe Twitter the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

134.   The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

135.   The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

136.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Twitter has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

137.   Plaintiff, on behalf of Twitter, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

138.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139.   By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Twitter.

140.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Twitter.

141.   Plaintiff, as a shareholder and representative of Twitter, seeks restitution from defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by defendants from their wrongful conduct and fiduciary breaches.

142.   Plaintiff, on behalf of Twitter, has no adequate remedy at law.

**COUNT IV**

**Against the Individual Defendants for Waste of Corporate Assets**

143.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

144.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and on-going harm to the Company.

145.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) by paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

146.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

147.    Plaintiff, on behalf of Twitter, has no adequate remedy at law.

**COUNT V**

**Against the Insider Selling Defendants for Breach of Fiduciary Duty
for Insider Selling and Misappropriation of Information**

148.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.    At the time the Insider Selling Defendants sold their Twitter stock, they knew the information described above, and sold Twitter stock on the basis of such information.

150.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants misappropriated to their own benefit when they sold Twitter stock.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

151.    The Insider Selling Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

152.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

153.    Plaintiff, on behalf of Twitter, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all Defendants for the amount of damages sustained by the Company as a result of Defendants' violations of federal law, breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and insider selling;

B.    Directing Twitter to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Twitter and its shareholders from a repeat of the damaging events described herein, including but not limited to putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Twitter's directors, executives and other employees;

- a proposal to require an independent Chairman of the Board;

- a provision to permit the shareholders of Twitter to nominate at least three candidates for election to the Board to replace existing directors;

46
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

- • a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

2

3

- • a provision to appropriately test and then strengthen the Company's internal operational control functions;

4    C.    Awarding to Twitter restitution from the Individual Defendants, and ordering

5    disgorgement of all profits, benefits, and other compensation obtained by the Individual

6    Defendants;

7    D.    Awarding to Plaintiff the costs and disbursements of the action, including

8    reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

9    E.    Granting such other and further relief as the Court deems just and proper.

10                                **JURY DEMAND**

11    Plaintiff demands a trial by jury.

12

13    Dated: October 24, 2016                        JOHNSON & WEAVER, LLP

14                                                   FRANK J. JOHNSON
                                                     PHONG L. TRAN

15

16                                       By:  _s/Frank J. Johnson_____

17                                             FRANK J. JOHNSON

18                                             600 West Broadway, Suite 1540
                                               San Diego, CA 92101

19                                             Telephone: (619) 230-0063
                                               Facsimile: (619) 255-1856

20                                             frankj@johnsonandweaver.com
                                               phongt@johnsonandweaver.com

21                                             *Attorneys for Plaintiff JIM PORTER*

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

DocuSign Envelope ID: 6D48CFEC-36DB-4A83-B7CE-30955616739E

## **<u>VERIFICATION</u>**

I, Jim Porter, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated:  October 21, 2016

DocuSigned by:

*Jim Porter*

CACBB921FD57446...

(Signature of Jim Porter)